(707 P.2d 1083)

No. 57,176

BRUCE MOOTS, *Appellant*, v. BANKERS LIFE CO., and DILLON COMPANIES, INC., now a subsidiary of Kroger Stores and THE TRUSTEES OF THE DILLON COMPANIES EMPLOYEE BENEFIT TRUST, *Appellees*.

Opinion filed October 24, 1985.

*Herbert R. Hess, Jr.*, of Hutchinson, for the appellant.

*J. Stanley Hill*, of Branine, Chalfant & Hill, of Hutchinson, for the appellees.

Before BRISCOE, P.J.; TERRY L. BULLOCK, District Judge, assigned; and FREDERICK WOLESLAGEL, District Judge Retired, assigned.

BULLOCK, J.: Bruce Moots was insured under a group policy of disability insurance from Bankers Life Co. Thereafter, Moots suffered disabling back injuries. As a result of these disabilities,

Bankers paid Moots monthly benefits under the policy for approximately two years. For reasons not fully developed in the record, Bankers then terminated payments to Moots and Moots filed suit seeking both past due and future payments. Bankers moved for summary judgment, contending that Moots was not entitled to any payments for the sole reason that he had taken a job driving a bus *subsequent* to the termination of payments by Bankers. Upon these uncontroverted facts, the trial court granted summary judgment to Bankers. This appeal followed.

We turn first to the relevant portion of the disability contract:

"TOTAL DISABILITY. Total disability, for the purposes of this Policy, means the complete inability of the Person, due to accidental bodily injury or sickness, or both

  (a) during the first twenty-four months of such disability, to perform any and every duty pertaining to his own occupation; and

  (b) during any continuation of such disability following the first twenty-four months of disability, to engage in any work or occupation for which he is reasonably fitted by education, training or experience; and provided further, that he does not engage in any occupation, work or employment for wage or profit during any such disability."

Bankers concedes that subparagraph (a) provides what is commonly known as "occupational" disability coverage for the first 24 months of disability. Under "occupational" coverage, if an insured is unable, by reason of his disability, to perform the usual and customary duties of his *actual* occupation, disability payments are owing. In the case at bar, Bankers further concedes that Moots was occupationally disabled for the first 24 months after his injuries and was thus entitled to the payments which Bankers paid.

The only question remaining is whether Moots is entitled to further payments under subparagraph (b) of the policy beyond the initial 24-month period of "occupational" disability coverage under subparagraph (a). Subparagraph (b) provides what is commonly described as "general" disability coverage. Under "general" disability coverage, in order to recover the insured must not only be unable to perform the duties of his *actual* occupation, but likewise be unable to "engage in any work or occupation for which he is reasonably fitted by education, training or experience . . . ." See 15 Couch on Insurance 2d § 53:45 (rev. ed. 1983), for a similar explanation of the difference between "occupational" and "general" disability coverage. "General," or as

is sometimes called "total," disability insurance provisions have been often construed. For many years virtually all courts have held that although the insured must prove inability to perform all jobs for which he is suited by training, education or experience, total helplessness is not required as a condition precedent to recovery for "general" or "total" disability. Specifically, the mere fact that the insured continues to do some compensable work will not alone bar recovery. In *Simmons v. Wilson Employees Mut. Benefit Fund,* 145 Kan. 128, 64 P.2d 50 (1937), an insured was not denied total disability benefits despite the fact that he performed manual labor on relief jobs. The *Simmons* court observed:

"The fact plaintiff had done work on relief projects would indicate it was imperative he do something to provide food and shelter. He probably thought it was just as well to die trying to work as to starve to death. The fact he did some work at the risk of life did not mean he was not entitled to recover for total permanent disability. [Citations omitted.]" 145 Kan. at 130.

Although Bankers does not quarrel with these general principles pertaining to usual or typical "general" disability provisions, it argues that the final proviso of subparagraph (b) in the subject policy takes this case outside usual rules and alters the result in its favor. That proviso follows:

"[P]rovided further, that he does not engage in any occupation, work or employment for wage or profit during any such disability."

Bankers contends that under this so-called "conduct" clause, Moots is barred from all "general" disability benefits because, some four months after they terminated his payments, he accepted limited employment as a school bus driver. Although no Kansas cases have been found construing a similar "conduct" provision in a general disability insurance clause, other courts have done so.

In *Stoner v. New York Life Ins. Co.,* 90 S.W.2d 784 (Mo. App. 1936), the policy contained a general clause defining total disability to be when the insured "is so disabled by bodily injury or disease that he is wholly prevented from performing any work, from following any occupation, or from engaging in any business for remuneration or profit . . . ." 90 S.W.2d at 787. The *Stoner* court held that the concluding phrase of the insuring clause did not alter the general insuring clause of the policy. The *Stoner* court held:

"[T]he insuring clause gives the right to benefits when insured is disabled so as to prevent the doing of certain things. The last clause but negatives his right to benefits when he is not so prevented, but when he is able so to engage and does so engage. They are correlative clauses. Both are to be given the same construction. It would be anomalous that the language employed when found in the insuring clause in one part of the policy should be given one construction and when found in another part of the policy should be given another. In the insuring clause, such language is construed to mean that insured is totally disabled when he cannot perform the material and substantial acts of his occupation [or others for which he is reasonably suited] and is thereupon entitled to benefits; in the last (so-called conduct) clause, it is to be construed as meaning that plaintiff is not totally disabled when he is able to and does perform the substantial and material acts of his occupation [or others for which he is reasonably suited] and is not in such event entitled to benefits. There is then no conflict between the two clauses. The latter has no effect to limit or vary the former. It is but declaratory of the former. It was doubtless inserted in the policies to enable the defendant to review the condition of plaintiff and his disabilities from time to time and to discharge itself of liability under the policies when it is found that plaintiff's disabled condition has so far improved that he is again able substantially to carry on his occupation or substantially to engage in others [for which he is reasonably suited]." 90 S.W.2d at 793.

In *Mutual Life Ins. Co. v. Clark*, 255 Ark. 741, 502 S.W.2d 110 (1973), the policy in issue defined total disability as "disability which wholly and continuously disables the member so that he can perform no duty pertaining to his occupation and during which he is not engaged in any occupation for remuneration or profit." 255 Ark. at 745. The Arkansas court likewise refused to construe the clause literally, holding that the insured was not required to prove that he was not engaged in *any* occupation for remuneration or profit as a condition precedent to recovery. 255 Ark. at 748.

Considerations of policy militate a similar result. It is well known that severely disabled persons, for reasons of physical and mental health, are frequently encouraged by their physicians to take some type of work as therapy. If insureds were able to follow such valuable medical advice only at the peril of losing their only real means of financial survival, we would create for the already disabled a heavy burden indeed. Further, an opposite result would put all insureds at the absolute mercy of their insurers. In such a situation, the insurer could simply terminate disability benefits, wait until the insured is driven by dire necessity to seek *any* kind of employment, and then justify the termination retrospectively based on the subsequent employ-

ment. In a society which values work and applauds extraordinary effort by the handicapped, such a result would be anomalous, to say the least.

For all of these reasons we hold that a "conduct clause" appended to a general disability insuring agreement, which states, "provided further, that [the insured] does not engage in any occupation, work or employment for wage or profit during any such disability":

(a) does not require a departure from customary rules of construction pertaining to the degree of disability necessary for recovery under general disability insurance policies, and

(b) is construed to be merely the negative or mirror image of the insuring clause; as such, the insured is barred from recovery only if he *is able* to perform "any work or occupation for which he is reasonably fitted by education, training or experience."

Accordingly, we reverse the decision of the trial court and remand with directions to proceed with trial to determine whether Moots can prove he is "generally" disabled in accordance with this opinion.